UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LATONYA CONNALLY,

     Plaintiff,

v.

UNITED STATES DEPARTMENT OF
VETERANS AFFAIRS,

     Defendant.

Case No. 22-10236
Honorable Laurie J. Michelson
Magistrate Judge Kimberly G. Altman

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [28]**

---

In June of 2019, the John D. Dingell Department of Veterans Affairs Medical Center in Detroit, Michigan, hired LaTonya Connally as a registered nurse. And in July of 2020, it fired her. Connally asserts that her termination was unlawful under three statutes: the Emergency Paid Sick Leave Act, a temporary relief effort that gave federal employees paid leave for COVID-related reasons; the Family and Medical Leave Act; and a then-effective Michigan law.

Starting in January 2020, Connally faced a series of family and health issues. By April 2020, she had exhausted all her available leave time. So when she missed eight more days of work for COVID-related reasons, Connally was marked "AWOL," or absent without leave, ultimately resulting in her termination.

But according to Connally, these eight days would have been excused and statutorily protected had the Detroit VA provided her with the retroactive sick leave she was entitled to under the Emergency Paid Sick Leave Act. Connally alleges that

the Detroit VA violated EPSLA by failing to give her EPSLA leave and by discouraging her from, and then firing her for, requesting leave under the Act. Connally further claims that the VA violated the FMLA by terminating her in retaliation for requesting FMLA leave and violated the Michigan COVID-19 Employment Rights Act by terminating her for quarantining as was required by state law.

The VA has now moved for summary judgment on all of Connally's claims. (*See* ECF No. 28.) The motion is fully briefed (*see* ECF Nos. 29 (Connally's response), 35 (VA's reply)) and does not require further argument, *see* E.D. Mich. LR 7.1(f).

For the reasons that follow, the Court GRANTS IN PART and DENIES IN PART the VA's motion for summary judgment.

## I. Factual Background

Because the VA seeks summary judgment, the Court accepts as true all of Connally's factual allegations and presents them below. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Connally began working for the Detroit VA as a registered nurse in June 2019. (ECF No. 28-32, PageID.2654.) She was hired as a full-time "float" nurse for the hospital's outpatient mental health programs. (*See id.* at PageID.2641, 2645; ECF No. 28-7, PageID.1813; ECF No. 28-9, PageID.2134–2135.)

By all accounts, Connally did her job well. One nursing manager testified that she "did great work." (ECF No. 28-9, PageID.2176.)  But as a new hire, Connally was

subject to a two-year probationary period where she could be terminated more easily than a non-probationary nurse. (ECF No. 28-5, PageID.1331.)

Approximately six months into this probationary period, Connally "encountered several unfortunate life circumstances with [her] family" and began missing work with some regularity. (ECF No. 28-34, PageID.2702; *see id.* at PageID.2632.) By July 2020, Connally was terminated. (*See* ECF Nos. 28-35, 28-36.)

### A. Connally's Absences

### 1. First Absences in January and February 2020

In January 2020, Connally's mother had emergency surgery and from then on required 24-hour care. (*See* ECF No. 28-2, PageID.1176; ECF No. 28-34, PageID.2702.) Connally was "suddenly tasked with becoming [her] mother's sole caretaker." (ECF No. 28-34, PageID.2702.) But Connally was not eligible to take leave under the Family and Medical Leave Act because she had only worked for the VA for about seven months. *See* 29 U.S.C. § 2611(2)(A) (defining an "eligible employee" under the FMLA as one who has worked for the employer for at least 12 months); (ECF No. 28-34, PageID.2702.) So she requested "family friendly leave," which allowed her to use her accrued sick leave to care for her mother. (*See* ECF No. 28-32, PageID.2664; ECF No. 28-34, PageID.2702.)

Connally wound up missing 57.25 hours—a little over seven days—in the 36 days between January 13, 2020, and February 18, 2020. (*See* ECF No. 28-32, PageID.2633.) Then Connally ran out of available leave time. (*See id.* at PageID.2632; ECF No. 28-2, PageID.1177.) In late February 2020, Connally's supervisor, Yvette

Nickerson, sent Connally a "sick leave counseling" letter, informing her that she had "[l]ess than 24 hours sick leave balance." (ECF No. 28-10.) Connally could still request to use vacation time or unpaid leave in lieu of sick leave, but her requests did "not have to be granted," the letter explained. (*Id.*; *see also* ECF No. 28-5, PageID.1315–1316 (deposition of human resources employee) (explaining supervisors' discretion to grant use of annual leave for sick leave purposes).) The letter also warned that "your absence from duty has an adverse impact upon the operational efficiency of this service." (ECF No. 28-10.)

When Connally received the counseling letter on February 28, she had not taken any time off for 10 calendar days. As far as the Court can tell, Connally did not take any time off again until March. (*See* ECF No. 28-32, PageID.2633.)[1]

## 2. The Effects of COVID-19 in March 2020

Then came a global pandemic.

At the beginning of March 2020, Connally's mother was supposed to transfer from a skilled nursing facility to Connally's home. (*See* ECF No. 28-2, PageID.1180; ECF No. 28-34, PageID.2702.) Connally had no remaining sick leave, but Nickerson permitted her to use a few days of vacation time "in preparation [for] [her] mother's discharge." (ECF No. 28-34, PageID.2702; *see* ECF No. 28-7, PageID.1824; ECF No. 28-32, PageID.2633.)

---

[1] All of Connally's absences, labeled by leave type, are organized in a single chart at the end of Section I.A. *See infra* Section I.A.4.

4

But Connally's mother was not discharged as planned. Instead, she was admitted to the hospital for an acute pulmonary embolism "complicated [by] the infection of COVID-19." (ECF No. 28-29, PageID.2615; *see* ECF No. 28-14, PageID.2287; *see also* ECF No. 28-2, PageID.1180.)

Connally kept Nickerson updated. On March 23, she informed Nickerson that her mother was in the hospital and had tested positive for COVID-19. (ECF No. 28-11, PageID.2264.) Two days later, Connally told Nickerson that she herself was feeling sick but had "none of the symptoms that are listed for the virus. No fever, no cough." (ECF No. 28-12, PageID.2270–2271.) The day after, March 26, Connally was cleared to go to work if she wore a mask. (ECF No. 28-11, PageID.2259; *see id.* at PageID.2261.) She texted Nickerson that she would "return to work tonight as instructed." (*Id.* at PageID.2257.)

However, Connally did not return to work that evening. (ECF No. 28-32, PageID.2634; *see* ECF No. 28-22.) She requested more time off to care for her mother (*see* ECF No. 28-7, PageID.1824; ECF No. 28-9, PageID.2226–2227), who was discharged from the hospital, still COVID positive, the following day (*see* ECF No. 28-2, PageID.1180–1181; ECF No. 28-14, PageID.2287; ECF No. 28-29, PageID.2615). Nickerson "granted [Connally] all the leave" that Connally had left. (ECF No. 28-7, PageID.1825.) When that ran out, the service chief approved three days of leave without pay. (*Id.* at PageID.1778, 1826; ECF No. 28-8, PageID.1981.)[2]

---

[2] By the Court's count, Connally missed work for nine days and two hours, or 74 hours total, in March. (*See* ECF No. 28-32, PageID.2633–2636 (Connally's "absence hours" from July 1, 2019, to May 19, 2020, labeled with leave types).)

Meanwhile, the global spread of COVID-19 made things at the VA "very, very hectic. People were dying." (ECF No. 28-8, PageID.1958.) As Nickerson told Connally at the time, the VA was in the midst of an "emergency" that required "all hands on deck." (ECF No. 28-11, PageID.2255.) Indeed, Connally's unit had its first COVID-positive patient in late March 2020. (ECF No. 28-9, PageID.2148.) And the VA was creating "disaster teams" in an effort to adequately staff the hospital with nurses from across the country. (*Id.* at PageID.1959.)

The national VA office was also frequently changing its guidance for staff who were exhibiting symptoms of the virus or who had been exposed. (*See* ECF No. 28-7, PageID.1830.) "At first they said if you [were] exposed[,] you ha[d] to be off two weeks," Nickerson explained. (*Id.*) But then "nobody" was at work because "everybody had been exposed," so a COVID exposure was no longer a sufficient reason to be absent. (*Id.*) And at certain points the need for staff was so great that "if you weren't positive of [sic] COVID and sick, [the VA] basically wanted to say that you were able to work." (*Id.*)

### 3. AWOL Status in April 2020

Connally was due to return to work on April 2, 2020. (ECF No. 28-2, PageID.1184.) But on April 1, Connally texted Nickerson that she would not be

According to the Detroit VA's timekeeping records (*id.*) and her supervisor's summary (*id.* at PageID.2632), all of Connally's March absences were covered and excused, whether by annual leave in lieu of sick leave, family friendly leave, or sick leave.

Seven of Connally's ten absences—on March 14, 23, 24, 25, 26, 30, 31—appear to have been COVID-related. (*See* ECF No. 28-2, PageID.1180–1182; ECF No. 28-11, PageID.2265; ECF No. 28-27, PageID.2610.) While those in early March—March 2, 3, 4—do not seem to have been COVID-19 related. (*See* ECF No. 28-34, PageID.2702.)

coming back as planned. (ECF No. 28-11, PageID.2256.) She wrote, "I will not be able to return to work tom[orrow] . . . as I originally thought. Things are not going well for my mother." (*Id*.) Nickerson responded, "Please know you have used all available sick leave as family leave . . . I cannot grant you any additional leave at this time. . . . If you do not return your status is AWOL. You are a probationary employee and this could jeopardize your employment." (*Id*.)[3] Connally wrote back, "It's not my intent to jeopardize my employment. My mom is in a battle for her life right now." (*Id*.)

That same day, Connally filed a formal request for leave without pay from April 1 to June 10, 2020. (ECF No. 28-14, PageID.2286.) She cited "a serious health condition" in her request and provided HR with a letter from her mother's physician explaining the care she would need from Connally. (*Id*. at PageID.2286–2287.)

An HR representative texted Connally the following morning, April 2, that she should "come to work" and texted again the next day, April 3, telling Connally that her request for leave without pay had been denied. (ECF No. 28-16, PageID.2472, 2746.) Connally received a formal denial letter from HR two weeks later, on April 16. (*See* ECF No. 28-23.)

Connally did not return to work. In addition to texting Nickerson that her mother was doing badly (*see* ECF No. 28-11, PageID.2256), she told Nickerson via

---

[3] Nickerson was referring to the fact that Connally's first two years of employment with the VA were "probationary," as was the case for all newly hired registered nurses pursuant to 38 U.S.C. § 7403(b). Her work was subject to "continual[] review" to determine whether it was "fully qualified and satisfactory." (ECF No. 28-3, PageID.1233, 1235; *see* ECF No. 28-5, PageID.1331.)

phone call that she was herself experiencing symptoms of COVID-19 (ECF No. 28-2, PageID.1190).

Connally went on to miss 15.5 days, or 124 hours, of work in April 2020. (*See* ECF No. 28-32, PageID.2635, 2638.) Her absences from April 2 to April 11—totaling 60 hours, or 7.5 days—were covered by recently accrued family friendly leave and annual leave in lieu of sick leave. (*See* ECF No. 28-7, PageID.1824–1825, 1924–1925; ECF No. 28-32, PageID.2632, 2635–2637.) But starting on April 12, Connally was designated "AWOL" on scheduling and payroll records. (*See* ECF No. 28-13, PageID.2284; ECF No. 28-17, PageID.2480; ECF No. 28-32, PageID.2633–2638; *see also* ECF No. 28-32, PageID.2672.)

Three days later, on April 15, Nickerson emailed HR an informal request for Connally's termination. (ECF No. 28-20; *see* ECF No. 28-24, PageID.2579–2580.) The request was only "informal" because VA policy requires "summary review" before a probationary employee can be terminated. (*See* ECF No. 28-3, PageID.1233–1234; ECF No. 28-21, PageID.2534.) That is, if a registered nurse exhibits "any conduct or performance issues" (ECF No. 28-6, PageID.1529) "at any time during the probationary period" (ECF No. 28-3, PageID.1233), that nurse's supervisor may request that a Summary Review Board of fellow registered nurses convene to "review . . . available records and information," "issue findings," and ultimately "recommend the employee's retention or separation" (*id.* at PageID.1233–1234; *see* ECF No. 28-5, PageID.1459). VA policy does not permit supervisors to request or recommend termination—they may only request summary review and thus trigger

the process that could lead to the Board recommending termination. (*See* ECF No. 28-21, PageID.2538.)

In her email to HR, Nickerson cited Connally's frequent absences and AWOL status. (*See* ECF No. 28-20.) An HR representative responded to the email, directing Nickerson to send Connally a return-to-duty letter. (*See* ECF No. 28-5, PageID.1324, 1326, 1382; ECF No. 28-7, PageID.1797.) So on April 16, Nickerson sent Connally a letter informing her that she "ha[d] not reported for duty since March 19, 2020" and was "in an absence without leave (AWOL) status." (ECF No. 28-22.) Connally was "ordered to report for duty on April 23, 2020 or provide acceptable documentation indicating the reason(s) why [she was] unable to report for duty." (*Id.*) The same day, HR sent Connally the letter denying her earlier request for leave without pay. (ECF No. 28-23.)

When Connally received the letters, she reached out to Nickerson for the first time since about April 2. (*See* ECF No. 28-2, PageID.1187–1188; ECF No. 28-7, PageID.1853, 1863; *see also* ECF No. 28-9, PageID.2143.) She told Nickerson that her return-to-duty date of April 23 coincided with the end of her self-quarantine period, so she would report for duty as directed. (*See* ECF No. 28-7, PageID.1797; ECF No. 28-24, PageID.2579.) And she did. (*See* ECF No. 28-2, PageID.1193; ECF No. 28-5, PageID.1391; ECF No. 28-32, PageID.2632.)

All told, between April 12, when Connally exhausted her approved annual leave, and April 23, when Connally returned to work per Nickerson's letter, Connally

was "AWOL" for 8 days, or 64 hours. (*See* ECF No. 28-7, PageID.1940; ECF No. 28-32, PageID.2630.)

It does not appear that Connally missed work again after she returned. (*See* ECF No. 28-5, PageID.1389; ECF No. 28-32, PageID.2630–2638; ECF No. 28-34, PageID.2702.) But the termination process proceeded nonetheless. (*See* ECF No. 28-7, PageID.1894; ECF No. 28-24, PageID.2578–2579.)

### 4. Summary of Absences

To recap, and because this data is important in analyzing the EPSLA issue, the Court understands the timeline of Connally's absences between January and April 2020 to be the following:

|  | January 2020 | February 2020 | March 2020 | April 2020 | **Total Hours Absent in 2020** |
|---|---|---|---|---|---|
| Hours of Family Friendly Leave | 32 | 24 | 8 | 20 | 84 |
| Hours of Sick Leave |  | 1.25 | 6.75 |  | 8 |
| Hours of Annual Leave in Lieu of Sick Leave |  |  | 59.25 | 40 | 99.25 |
| Hours AWOL |  |  |  | 64 | 64 |
|  | **32** | **25.25** | **74** | **124** | **255.25** |

So of Connally's 255.25 hours of missed work, 191.25 hours were covered by a combination of family friendly leave, sick leave, and annual leave in lieu of sick leave. What is in dispute is whether Connally could be lawfully terminated for the 64 hours, or 8 days, that she was AWOL, or whether those hours were retroactively covered by statute and thus protected.

10

## B. EPSLA Leave Announced and Requested

On May 5, 2020, 12 days after Connally's "return to duty," hospital employees received an email informing them that they were eligible for up to 80 hours of paid leave, and that leave was "retroactive to April 1, 2020," under the new Emergency Paid Sick Leave Act ("EPSLA"). (*See* ECF No. 28-26, PageID.2590–2591.) The email rescinded previous VA guidance that had suggested that hospital employees were exempt from federal leave entitlements as health care providers or emergency responders. (*See id.* at PageID.2590.) The email went on to explain how an employee could request EPSLA leave and what rate of pay an employee could expect depending on the reason for their leave. (*See id.* at PageID.2593–2597.)

Relevant here, EPSLA gave employees their full rate of pay for up to two weeks if they took leave because they were experiencing COVID-19 symptoms or because they were advised to quarantine due to COVID-19. (*Id.* at PageID.2593); EPSLA § 5510(5)(B)(i); *see also* 29 C.F.R. § 826.22(a). If an employee took leave to care for someone else who contracted COVID-19, the employee would be entitled to two-thirds of their regular rate of pay. (ECF No. 28-26, PageID.2594); EPSLA § 5510(5)(B)(ii); *see also* 29 C.F.R. § 826.22(b).

But, the email advised, the VA payroll system did not yet have a mechanism to pay employees two-thirds of their regular wages. (ECF No. 28-26, PageID.2595.) So all employees would receive their full pay regardless of the qualifying reason for their leave, and employees who were entitled to only two-thirds of their pay under EPSLA would have to reimburse the VA for the one-third overpayment. (*Id.* at

PageID.2604, 2608.) In other words, said the VA, employees "may incur a debt" for EPSLA leave taken to care for someone else. (*Id.* at PageID.2608.)

After receiving the email, Connally reached out to an HR representative and asked "if this leave would . . . erase [her] AWOL" status. (ECF No. 28-2, PageID.1195.) She was told that it would. (*Id.*)

So on May 8, Connally emailed Nickerson requesting EPSLA leave. (*See* ECF No. 28-27, PageID.2609.) She gave two qualifying reasons: she had "been advised by a healthcare provider to self quarantine related to COVID-19" and she had been "caring for an individual" who contracted COVID-19 and who was also under a quarantine order. (*Id.*) Along with her request, Connally submitted "[s]upporting documentation." (*Id.*) She first attached a letter from her mother's doctor dated April 1 which advised that Connally "was required to help in the caring of her mother who was discharged home and is asked to remain in self-quarantine for another 2 weeks." (*Id.* at PageID.2610.) Second, Connally provided a letter from her own doctor dated April 14, explaining that Connally had been exposed to COVID-19 and was "symptomatic begin[n]ing 4/7/20. She should remain in quarantine till symptoms resolve and 14 days have passed since start of symptoms." (*Id.* at PageID.2611.)

On May 12, four days after submitting her EPSLA leave request, Connally emailed Nickerson to follow up. (ECF No. 31-16.) She wrote, "Are there any updates or approval? Please advise on timeframe of decision." (*Id.*) Nickerson responded a few hours later: "I can start the process to convert this period of time to [C]ovid-19 sick leave[.] Anything other than sick leave will create a debt and can be subtracted from

12

future pay." (ECF No. 28-12, PageID.2274.) Connally thanked Nickerson and asked if she "need[ed] anything further." (*Id.* at PageID.2275.) Nickerson replied, "As long as you understand it will create a debt," and then stated, "I need[] your mother's discharge papers." (*Id.*) Connally wrote back, "I don't want to create a debt," then provided the documentation. (*Id.* at PageID.2276; *see also* ECF No. 28-29, PageID.2614.) Nickerson later explained that she understood Connally's statement "I don't want to create a debt" to mean that Connally no longer wanted to request or obtain EPSLA leave. (ECF No. 28-7, PageID.1930, 1939.)

The next day, May 13, Connally emailed Nickerson about her EPSLA request again. "I read about the 2/3rd payment . . . I don't want to be in debt or owe anything, so can it be done in such a way where I don't incur a debt? Please advise, or let's discuss further." (ECF No. 28-29, PageID.2614 (cleaned up).) It does not appear that Nickerson responded to Connally's email. (*See id.*)

On June 2, Connally again inquired about her EPSLA request. (ECF No. 28-12, PageID.2278.) She texted Nickerson asking whether "a decision had been made regarding EPSL." (*Id.*) Nickerson replied, "You are not eligible . . . In our prior conversation you said you did not want to create a debt." (*Id.*) Connally agreed that she did not want to create a debt, writing, "Yes that is correct." (*Id.*) Nickerson responded, "Are you changing your mind[?]" (*Id.* at PageID.2279.) Connally said she was not changing her mind and "just wish[ed] she had a better understanding." (*Id.*)

They left it there; it does not appear that either Connally or Nickerson texted again after that. (*See id.*) And Connally's EPSLA request was never approved. Nor

13

does it appear that it was ever formally processed. All the while, Connally's continued employment by the VA remained under scrutiny.

## C. Summary Review and Termination

On May 19, 2020, Nickerson emailed a formal request for a Summary Review Board to convene and conduct a summary review of Connally's probationary employment. (ECF No. 28-32, PageID.2632.)

Nickerson's request cited the "conduct or performance issue"—Connally's AWOL status from April 12 to April 22, 2020—and described her efforts to address the issue—that she granted Connally's leave requests as long as Connally had leave time remaining, "warned" Connally that "her employment could be jeopardized by her AWOL status" after Connally's leave ran out, and sent Connally a return-to-duty letter. (*See* ECF No. 28-6, PageID.1529; ECF No. 28-21, PageID.2533, 2536, 2538; ECF No. 28-32, PageID.2632.) Nickerson also included "[s]upporting documentation": Connally's absence records, generated by the VA's scheduling software and labeled with leave types. (*See* ECF No. 28-21, PageID.2552; ECF No. 28-32, PageID.2632–2638; *see also* ECF No. 28-8, PageID.1991.)

A week later, Marla Gresham, the mental health service chief who had approved three days of leave without pay for Connally in March, echoed Nickerson's request, writing "I would like a special board for this RN" in an email to HR. (ECF No. 28-32, PageID.2632; *see* ECF No. 28-6, PageID.1529.)

By June 3, the Nurse Professional Standards Board—the group that periodically reviews the performance of each probationary nurse and conducts

14

summary review as needed—"ha[d] been made aware" of Gresham and Nickerson's request. (ECF No. 28-31, PageID.2626; *see* ECF No. 28-21, PageID.2538–2539.) The NPSB co-chairs in turn assembled, and sat on, Connally's Summary Review Board, one as a voting member and one as a non-voting secretary. (*See* ECF No. 28-6, PageID.1520; ECF No. 28-35, PageID.2711.) Two additional registered nurses were brought on as voting members, and an HR representative attended Board meetings as a non-voting "technical advisor." (*See* ECF No. 28-6, PageID.1520; ECF No. 28-21, PageID.2543; ECF No. 28-35, PageID.2711.) Nickerson, as the person recommending Connally's summary review, was ineligible to serve on Connally's Board. (*See* ECF No. 28-3, PageID.1234.)

By June 4, Nickerson provided HR with the extensive documentation (including timesheets, performance review, and one text exchange about Connally missing work) that became Connally's "evidence file." (*See* ECF No. 28-6, PageID.1535; ECF No. 28-21, PageID.2544, 2547; ECF No. 28-32.) This was then sent by HR to each Board member, and Connally's summary review meeting was scheduled. (*See* ECF No. 28-5, PageID.1460–1461; ECF No. 28-6, PageID.1609; ECF No. 28-21, PageID.2546; ECF No. 28-31, PageID.2626.)

A June 11 "notice letter" informed Connally that a Summary Review Board would convene on July 8 "to conduct a summary review of [her] conduct and performance during [her] probationary period and make recommendations concerning [her] retention in or separation from the Veterans Health Administration." (ECF No. 28-33, PageID.2697.) The letter also gave Connally the

15

reason for the review: "[her] unacceptable conduct; specifically, [her] attendance." (*Id.*; *see also* ECF No. 28-21, PageID.2546.) Finally, Connally was informed of her rights in the summary review process, including that she could review her evidence file and respond "orally and/or in writing" to the charges against her. (ECF No. 28-33, PageID.2697; *see also* ECF No. 28-3, PageID.1234.)

Connally did both. (*See* ECF No. 28-35, PageID.2711.) In advance of the summary review meeting, Connally submitted a written statement explaining her "mother's declining health," hospital admission, and eventual "discharge[] home to [Connally's] care" while sick with COVID-19. (ECF No. 28-34, PageID.2702.) Connally said she "was proactive" in alerting and working with HR "to find solutions while [she] worked through this major life transition" and likewise "worked with [her] team internally" when she had to miss work. (*Id.*) And she asserted that she had finally "been able to develop and implement a plan of care for [her] mother and ha[d] not missed work since returning" on April 23. (*Id.*) Connally attached some supporting documentation (e.g., doctors' letters and FMLA correspondence) that had not been included in the evidence file that Nickerson compiled. (*See, e.g.*, ECF No. 28-5, PageID.1373–1374; ECF No. 28-6, PageID.1672–1673.) Then, on July 8, Connally appeared before the Board to answer members' questions. (*See* ECF No. 28-2, PageID.1209; ECF No. 28-6, PageID.1657; *see also* ECF No. 28-21, PageID.2548.)

Although Connally said in her letter and verbal interview that COVID-19 played a role in her absences, she did not mention to the Board that she had requested EPSLA leave. (*See* ECF No. 28-2, PageID.1209–1210; ECF No. 28-34, PageID.2702.)

And Nickerson did not include Connally's EPSLA request, or any communication between Nickerson and Connally about the request, in Connally's evidence file. (*See generally* ECF No. 28-32.) So the Board never learned that Connally requested retroactive sick leave under EPSLA. (*See* ECF No. 28-5, PageID.1363; ECF No. 28-6, PageID.1652, 1679–1680; ECF No. 28-7, PageID.1850.)

In addition to speaking with Connally, the Board interviewed Nickerson, Gresham, and another VA nurse who, alongside but subordinate to Nickerson, had been supervising Connally since she began working midnight shifts in the residential care program. (*See* ECF No. 28-6, PageID.1656–1657; *see also* ECF No. 28-7, PageID.1778; ECF No. 28-9, PageID.2043, 2134–2135.) Each interview, including Connally's, lasted about 15 to 20 minutes. (*See* ECF No. 28-6, PageID.1656–1657.)

Finally, the Board deliberated in a closed session for around 30 minutes, reviewing and discussing the evidence file that Nickerson provided, the written documents and verbal information that Connally added, and the facts gleaned from the other interviews. (*See id.* at PageID.1535–1536, 1658.)

The Board ultimately voted to terminate Connally. (*See id.* at PageID.1544–1545, 1682; ECF No. 28-21, PageID.2565.) It memorialized its findings and recommendation in a Board Action form, writing, "The Board sustains the charge of alleged misconduct of AWOL time/attendance . . . [and] recommends separation of Latonya Connally from VA employment." (ECF No. 28-35, PageID.2710–2711.) On July 23, the Detroit VA's medical director approved the Board's July 8 recommendation. (*See id.* at PageID.2711; *see also* ECF No. 28-3, PageID.1236–1237.)

Connally was notified of the Board's decision on July 29. (*See* ECF No. 28-36.) Her termination was to be effective August 21, 2020. (*Id.* at PageID.2712.) On August 12, Connally sent a letter of resignation to the Detroit VA, effective August 14, 2020. (*See* ECF No. 28-37.)

## II. Procedural Background

In February 2022, Connally sued the VA. (*See* ECF No. 1.) She claims that her former employer violated EPSLA by failing to provide paid leave and by interfering with her rights under EPSLA (Count I). (*Id.* at PageID.3, 8–9.) She further contends that the VA violated both EPSLA and the FMLA by terminating her in retaliation for taking EPSLA and FMLA leave (Counts II–III). (*Id.* at PageID.10–11.) Finally, Connally alleges that the VA violated the Michigan COVID-19 Employment Rights Act by terminating her for complying with the law by not reporting to work (Count IV). (*Id.* at PageID.11–12.)

In April 2023, following the close of discovery, the VA moved for summary judgment on all of Connally's claims. (ECF No. 28.) Connally opposes the VA's motion as to all but her claim under Mich. Comp. Laws § 419.401. (*Id.* at PageID.2743.)

## III. Legal Standard

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Or, stated less formally, the VA is entitled to summary judgment only if no reasonable jury could

find in favor of Connally. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

## IV. EPSLA Claims

Start with Connally's claims under EPSLA.

In March 2020, Congress enacted the Families First Coronavirus Response Act, Pub. L. No. 116-127, 134 Stat. 178, as a temporary response to the COVID-19 pandemic. The FFCRA had two major provisions: the Emergency Paid Sick Leave Act, Pub. L. No. 116-127, §§ 5101–5111, 134 Stat. 195, 195–201 (2020), and the Emergency Family and Medical Leave Expansion Act, Pub. L. No. 116-127, §§ 3101–3106, 134 Stat. 189, 189–92 (formerly codified at 29 U.S.C. §§ 2612, 2620) (2020).

EPSLA required covered employers to provide up to 80 hours of paid sick leave to employees who were unable to work or telework for a qualifying COVID-19-related reason. *See id.* § 5102(a)–(b); *see also* 29 C.F.R. §§ 826.20–.21. The Act listed six qualifying reasons, which can be separated into two categories for purposes of this case: entitlement to EPSLA leave either because of the employee's *own* COVID-19 exposure or symptoms or because the employee was caring for *someone else* with COVID-19. *See* EPSLA § 5102(a). Because EPSLA was enforced through the Fair Labor Standards Act, an employer who violated EPSLA, for example by not providing paid sick leave to an employee who was statutorily entitled to it, was "considered to be in violation of" the FLSA and was "subject to the penalties described in" the FLSA. EPSLA § 5105; *see* 29 C.F.R. § 826.150.

Connally now claims the following EPSLA violations: unpaid sick leave under EPSLA § 5102, interference under EPSLA § 5102, and retaliation under EPSLA § 5104. (*See* ECF No. 1, PageID.8–9.)

## A. EPSLA Leave

Connally first claims that the VA violated EPSLA by failing to provide her with paid sick leave owed under the Act. (*Id.* at PageID.8.) The VA counters that Connally did not give proper notice of her request for EPSLA leave and thus did not establish her entitlement to paid sick leave under the Act. (*See* ECF No. 28, PageID.1137–1138.) Alternatively, the VA argues, "if this Court finds that Connally's request for leave was sufficient," that Connally "withdrew the request." (*See id.* at PageID.1143.)

But issues of fact remain as to both. So the VA's motion for summary judgment on the EPSLA leave claim will be denied.

## 1. Reasonable Notice

To be entitled to paid leave, EPSLA required employees to provide their employers with "reasonable notice" of their need for leave. EPSLA § 5110(5)(e). According to the applicable federal regulations, it was "[g]enerally . . . reasonable for an Employer to require" the notice to contain "sufficient information . . . to determine whether the requested leave is covered by the EPSLA." 29 C.F.R. § 826.90(c). And "as soon as practicable," employees had to submit documentation containing (1) the employee's name, (2) the dates for which the employee was requesting leave, (3) a qualifying reason for leave, and (4) a verbal or written statement that the employee was not able to work "because of the qualified reason for leave." *Id.* § 826.100(a).

Further, if the employee sought EPSLA leave because they were advised to self-quarantine based on COVID-19 concerns or because they were caring for someone who was so advised, the employee had to provide the name of the advising health care provider. *Id.* § 826.100(c)–(d). But employers could not require "documentation beyond what is allowed" in that list. *Id.* § 826.90(c). And if an employee "fails to give proper notice, the Employer should give him or her notice of the failure and an opportunity to provide the required documentation prior to denying the request for leave." *See id.* § 826.90.

In seeking summary judgment, the VA contends that Connally "did not identify the dates for which she sought EPSLA leave" and thus failed to submit proper notice of her request. (ECF No. 28, PageID.1141.) However, a reasonable jury could conclude that Connally's notice was sufficient.

Connally emailed Nickerson with her request and cited "the following qualifying reasons:" (1) a health care provider advised her to self-quarantine due to COVID-19 concerns and (2) she had been caring for an individual who was themselves self-quarantining based on a health care provider's instruction. (ECF No. 28-27, PageID.2609.)

While Connally's email did not include leave dates, she attached two letters from physicians, each of which can be read to suggest or imply requested dates. (*Id.* at PageID.2610–2611); *see, e.g., Rivera v. REP Corp. NA*, No. 21-273, 2022 WL 4783165, at *5 (E.D. Tenn. Sept. 30, 2022) (on motion to dismiss, rejecting employer's argument that employee failed to meet EPSLA's documentation requirement, *see* 29

21

C.F.R. § 826.100(a), and reasoning that "Plaintiff informed Defendant of . . . the general timeframe of her request, which was a 'brief' period of leave that would begin immediately"); *see also Adkins v. Maida*, No. 21-82264, 2022 WL 18532783, at *4 (S.D. Fla. July 5, 2022) (on motion to dismiss, concluding that employee's verbal request to work remotely or, "in the alternative," to take paid leave while child's school was closed due to COVID-19 constituted sufficient notice under EPSLA or EFMLEA and reasoning that, even though employee did not "set forth specific dates in his leave request, it is clear Plaintiff requested to go on leave immediately" and "it is unlikely that Plaintiff could have provided an accurate end-date in his paid leave request given the unpredictable and often-indefinite nature of school shutdowns during COVID-19").

First, the letter from Connally's treating physician stated that she had a "known exposure to COVID-19," "has been symptomatic begin[n]ing 4/7/20," and "should remain in quarantine [un]til[] . . . 14 days have passed since start of symptoms." (ECF No. 28-27, PageID.2611.) And Connally's mother's physician wrote on April 1, 2020, that Connally was "required to help in the caring of her mother who was discharged" from the hospital with COVID-19 and was "asked to remain in self quarantine for another 2 weeks." (*Id.* at PageID.2610.) The letters thus implicate two qualifying reasons for EPSLA leave, which Connally noted in her accompanying email—caring for someone who was self-quarantining, and personally self-quarantining due to COVID-19 concerns and on the advice of a health care provider— and provide a time period related to those reasons. *See* EPSLA § 5102(a)(2), (4).

This could support a reasonable jury in finding that Connally supplied the VA with enough information to satisfy EPSLA's notice requirements. One plausible reading of the letters in context is that Connally was instructed to quarantine from April 1 to April 15, 14 days from the date of her mother's physician's letter, and that her request for EPSLA leave was for April 12 to April 23, the dates she was marked AWOL.

What is more, Connally was requesting leave retroactively, so the VA already knew the dates that she was absent without leave. And Connally has provided ample evidence that she requested EPSLA leave primarily to resolve her AWOL charge and that the VA knew this. Nickerson had warned Connally that being designated AWOL "could jeopardize [her] employment." (ECF No. 28-11, PageID.2255.) To avoid being AWOL, Connally requested leave without pay to cover her April absences, but this was denied. (*See* ECF No. 28-14; ECF No. 28-23; *see also* ECF No. 28-32, PageID.2665.) Then, upon learning that VA employees were entitled to EPSLA leave, Connally asked HR "if this leave would . . . erase [her] AWOL" status. (ECF No. 28-2, PageID.1195.) So at a minimum, a jury could find that Connally requested EPSLA leave specifically for the dates on which she was AWOL.

Indeed, Nickerson appears to have understood which dates Connally's request referenced, or at least appears to have believed she had enough information to proceed with the request. On May 12, Nickerson texted Connally, "I was directed to Joe in HR. I can start the process to convert *this period of time* to [C]ovid-19 sick leave[.] Anything other than sick leave will create a debt and can be subtracted from

future pay." (ECF No. 28-12, PageID.2274 (emphasis added).) Nickerson's reference to "this period of time" suggests that she had in mind a specific time frame that Connally's EPSLA leave could or would retroactively cover.[4]

Finally, EPSLA's implementing regulations clearly stated that employers were supposed to request additional information if an employee's notice was deficient. 29 C.F.R. § 826.90(a)(l) ("If an Employee fails to give proper notice, the Employer should give him or her notice of the failure and an opportunity to provide the required documentation prior to denying the request for leave."). But the VA did not give Connally an opportunity to cure any perceived deficiencies. If it thought her notice was improper for failing to provide requested leave dates, it did not tell Connally. *Cf. Atwood v. JCF Residences Mgmt. Co.*, No. 20-00056, 2022 WL 185187, at *6 (M.D. Tenn. Jan. 19, 2022) (rejecting employer's motion for summary judgment as to employee's claims under analogous FFCRA provision, the Emergency Family and Medical Leave Expansion Act, and describing employer's notice argument as "hypertechnical and misplaced" because "[n]ot only" did the employee adequately

---

[4] Plus, Connally responded, "I understand that it is only for 10 days and I was gone for greater than 10 days. . . . I don't want to create a debt. . . . Just use it for the amount of time which is the 10 days." (ECF No. 28-2, PageID.2275–2276.) Certainly, a reasonable jury could find Connally's message unclear and conclude that it did not improve Nickerson's understanding of the operative dates. But a reasonable jury could also read Connally's text as indicating that she only wanted EPSLA leave for the days she was symptomatic, which would have been fully covered by EPSLA, rather than the days on which she was caring for her mother, which would have been reimbursed at two-thirds of her normal pay and would "create a debt." Or a jury could read the text as informing Nickerson that Connally wanted EPSLA leave to apply to 10 of the days she was absent for COVID-related reasons, at least including the days she was designated AWOL.

state the reason for her leave request but also "the regulations clearly provide that an employer should request additional information if the notice is deficient"); *Adkins*, 2022 WL 18532783, at *5 (citing *Atwood*, 2022 WL 185187, at *6; 29 C.F.R. § 826.90(a)) ("Although now attacking the sufficiency of the notice, Defendants had ample opportunity in the days following the request to seek additional information to determine if the leave requested was covered by the FFCRA, but Defendants failed to do so as required by the implementing regulation.").

Courts have liberally construed EPSLA's notice requirements in light of this regulation, "the flexibility of [EPSLA's] statutory scheme," and the liberal construction given to the FLSA, through which EPSLA was enforced. *See Gracia v. L. Offs. of Alexander E. Borell, P.A.*, 535 F. Supp. 3d 1268, 1272 (M.D. Fla. 2021) ("The Act strives to shield employees from COVID-19-related discrimination—not insulate employers from EPSLA lawsuits."); *cf. Russo v. Johnson*, No. 20-00820, 2022 WL 1787102, at *23 (M.D. Tenn. June 1, 2022) (on motion to dismiss, declining to "strictly appl[y]" EPSLA's notice requirements and noting that "the [employer's] agents . . . were aware that the [employee] was requesting leave for a reason covered by [EPSLA]"); *Rivera*, 2022 WL 4783165, at *5 (on motion to dismiss, concluding that "strict enforcement of [EPSLA's] documentation requirement is not warranted" in part because the employer "had sufficient information to determine whether Plaintiff qualified for paid sick time under the EPSLA" and in part because the employer "failed to afford Plaintiff an opportunity to cure any deficiencies"); *Haddon v. Jesse Stutts, Inc.*, No. 20-01830, 2021 WL 3089232, at *4 (N.D. Ala. July 22, 2021) ("[T]hose

allegations suffice at the pleading stage given the flexibility of [EPSLA's] statutory scheme and the liberal pleading standard for comparable EPSLA cases. These regulations do not establish strict notice requirements (nor can they, for that matter).").

So Connally has shown that there are questions of material fact as to the sufficiency of her request for EPSLA leave and whether she adequately indicated the leave dates she sought. Thus, summary judgment is not warranted on Connally's EPSLA leave claim on the basis that her leave request was improper.

### 2. Withdrawal of EPSLA Request

Likewise, the VA's claim that Connally withdrew her request for EPSLA leave presents a question of material fact.

This issue pertains to the correspondence between Connally and Nickerson about "incurring a debt." According to the VA, the following May 12 text exchange shows Connally withdrawing her EPSLA request:

> Nickerson: Ok i [sic] was directed to Joe in HR. I can start the process to convert this period of time to covid-19 sick leave[.] Anything other than sick leave will create a debt and can be subtracted from future pay

> Connally: G[ood] M[orning] Yvette. Thank you. Do you need anything further from me. I appreciate your consideration in this matter. I understand that it is only for 10 days and I was gone for greater than 10 days.

> Nickerson: As long as you understand it will create a debt

> Nickerson: I needed your mother's discharge papers

> Connally: I don't want it to create a debt.

> Connally: Why would you need her discharge papers. It includes her medications, future appointments, diagnosis.

Nickerson: Remove those items

Connally: Just use it for the amount of time which is the 10 days

Connally: It's all the pages... what information do you need.

(ECF No. 28-12, PageID.2274–2276.) Connally subsequently wrote, "I read about the 2/3rd payment . . . I don't want to be in debt or owe anything, so can it be done in such a way where I don't incur a debt? Please advise, or let's discuss further." (ECF No. 28-29, PageID.2614 (cleaned up).) There is no response in the record.

Nickerson apparently took Connally's statement that she did not want to incur a debt to mean that she no longer wanted EPSLA leave. (*See* ECF No. 28-7, PageID.1930.) When Connally texted Nickerson on June 2 "wondering if a decision had been made regarding EPSL," Nickerson told her, "You are not eligible" (ECF No. 28-12, PageID.2278.) Connally responded "? [sic] On what basis?" and Nickerson replied, "In our prior conversation you said you did not want to create a debt." (*Id.*)

But whether a finder of fact would interpret Connally's messages the same way that Nickerson did is a genuine question. Indeed, a reasonable jury could conclude that "Connally never withdrew her request" and instead "asked Nickerson for clarification over what she meant [when she said that Connally] would incur a debt" or requested that Nickerson process the request based on her own COVID illness, rather than her mother's, to avoid incurring a debt. (ECF No. 29, PageID.2736; *see also* ECF No. 28-2, PageID.1202; ECF No. 28-12, PageID.2278–2279; ECF No. 28-29.) A factfinder could further conclude that Connally never withdrew her EPSLA request, or rescinded her prior withdrawal, based on the fact that she emailed her

27

mother's discharge paperwork to Nickerson the day after the alleged withdrawal. (*See* ECF No. 28-29.) So the Court agrees with Connally that "[w]hether the correspondence between Ms. Connally and Ms. Nickerson constitutes a withdrawal is in and of itself a genuine issue of material fact." (ECF No. 29, PageID.2736.)

Thus, just as there are questions of fact regarding the sufficiency of Connally's EPSLA request, so too there are questions of fact regarding whether Connally withdrew her EPSLA request. The VA's motion as to Connally's EPSLA leave claim is denied.

### B. EPSLA Interference

The VA next asserts that it is entitled to summary judgment on Connally's EPSLA interference "claim." The Court agrees.

According to Connally, the VA "[i]nterfer[ed] with [her] right to protected leave under the EPSLA" by telling her that taking EPSLA leave "would cause her to 'owe a debt.'" (ECF No. 1, PageID.9 (citing EPSLA § 5102(a)).) But, as the VA says, "Congress did not provide a cause of action for interference under the EPSLA and no such claim may be implied against the government." (ECF No. 28, PageID.1145.)

The case law interpreting EPSLA and its regulations is "scant." *See Colombe v. SGN, Inc.*, No. 20-374, 2021 WL 1198304, at *2 (E.D. Ky. Mar. 29, 2021). "This is not entirely surprising, considering that the EPSLA was only in effect from April through December 2020." *Johnson v. Gerresheimer Glass Inc.*, No. 21-4079, 2022 WL 117768, at *3 (N.D. Ill. Jan. 12, 2022). But even within this limited case law, a consensus has emerged. It appears that each court to have considered whether

interference is a claim cognizable under EPSLA has concluded that it is not. *See, e.g.*, *Kovacevic v. Am. Int'l Foods Inc.*, No. 21-72, 2021 WL 3629756, at *4 (W.D. Mich. Aug. 17, 2021); *Alvarado v. ValCap Grp., LLC*, No. 21-1830, 2022 WL 19686, at *3 (N.D. Tex. Jan. 3, 2022); *Tran v. Acme Machell Co., Inc.*, No. 21-925, 2022 WL 3369626, at *5 (E.D. Wisc. Aug. 16, 2022); *King v. Okmulgee Cty. Jail Trust Auth.*, No. 21-367, 2023 WL 2976576, at *4 (E.D. Okla. Apr. 16, 2023); *Howard v. MHT USA LLC*, No. 21-04570, 2023 WL 5668064, at *29 (N.D. Ga. June 23, 2023), *report and recommendation adopted by* 2023 WL 5668035 (N.D. Ga. July 12, 2023); *cf. Adkins*, 2022 WL 18532783, at *5.

As these courts have observed, EPSLA, like its COVID counterpart EFMLEA, specified the employer conduct that constituted a violation of the Act. *See* EPSLA §§ 5102, 5104; 29 C.F.R. §§ 826.150–.151. But unlike EFMLEA, EPSLA did not expressly prohibit an employer from "interfering" with an employee's exercise or attempted exercise of their statutory rights. Instead, EPSLA made it unlawful for an employer to "discharge, discipline, or in any other manner discriminate against any employee who" takes leave under the Act. EPSLA § 5104. *Compare* 29 C.F.R. § 826.151(a) (EFMLEA regulation), *with* 29 C.F.R. § 826.150 (EPSLA regulation). EPSLA and EFMLEA thus took after the statutes that supplied their enforcement mechanisms—respectively, the FLSA and FMLA. *See* EPSLA § 5105 (citing 29 U.S.C. §§ 216, 217); 29 C.F.R. § 826.151(b) (citing 29 U.S.C. § 2617; 29 C.F.R. § 825.400). And the FLSA through which EPSLA was enforced, contains no prohibition on

interference, while the FMLA, through which EFMLEA was enforced, does. *Compare* 29 U.S.C. § 215, *with* 29 U.S.C. § 2615(a)(1).

So courts have reasoned that Congress clearly considered a right of action for interference and chose to allow employees to bring interference-based claims under only one provision of the Families First Coronavirus Response Act, not both. *See, e.g.*, *Kovacevic*, 2021 WL 3629756, at *4 ("EPSLA lacked a prohibition found in the FMLA. The FMLA expressly prohibits the employer from *interfering* with the employee's rights under the FMLA. The EPSLA did not."); *Alvarado*, 2022 WL 19686, at *3 ("Unlike the [FMLA], there is no provision in the EPSLA that specifically prohibits an employer from 'interfering' with an employee's rights under the statute."); *Tran*, 2022 WL 3369626, at *5 ("Instead of addressing either the acts prohibited by the EPSLA or the enforcement mechanism of the EPSLA, the plaintiff alleges that the defendant committed a violation through interference under 29 U.S.C. § 2615(a)(1) [FMLA's interference prohibition]. But the language of the EPSLA does not tie it to the FMLA."); *King*, 2023 WL 2976576, at *4 ("It is widely held that the EPSLA does not provide for an interference claim as it neither prohibits interference nor adopts or amends the FMLA."); *Howard*, 2023 WL 5668064, at *29 (dismissing EPSLA interference claim and agreeing with cases like *Kovacevic*, *Alvarado*, and *King* that no such claim is cognizable); *see also Alexander v. Sandoval*, 532 U.S. 275, 290 (2001).

In response, Connally asserts that the VA cannot cite "any *controlling* authority" precluding an EPSLA interference claim. (*See* ECF No. 29, PageID.2738.) True. But the *persuasive* authority is overwhelming. This Court does not have to be

bound by other courts' decisions to find them well reasoned and instructive. And Connally identifies no error of law, fact, or logic in these courts' analyses. She hangs her hat only on their lack of bindingness—yet does not and cannot cite any authority, controlling or otherwise, *recognizing* an EPSLA interference claim. (*See* ECF No. 35, PageID.3171.)

The Court sees no reason to depart from the weight of persuasive authority on this issue. Accordingly, the Court grants the VA's motion for summary judgment as to Connally's EPSLA interference "claim," i.e., her claim that the VA interfered with her rights under EPSLA. *See Alvarado*, 2022 WL 19686, at *3 ("Accordingly, the court grants [the employer's] motion to dismiss [the employee's] EPSLA claim to the extent it is based on the allegation that [the employer] 'interfered' with her rights under the EPSLA.").

And to the extent that Connally asserts that "Nickerson's conduct interfered with [her] rights under EPSLA and took the form of discipline and discharge," her interference claim collapses into her retaliation claim, given that EPSLA's antiretaliation provision prohibits discipline or discharge in response to protected conduct. (*See* ECF No. 29, PageID.2739.) The Court addresses EPSLA retaliation next.

### C. EPSLA Retaliation

Connally's final claim under EPSLA is for retaliation. She asserts that the VA terminated her "in retaliation for taking leave that should have been protected under

31

the EPSLA." (ECF No. 1, PageID.10.) This claim presents a closer call, but survives summary judgment.

EPSLA, like the FLSA, prohibits employers from retaliating against employees for engaging in conduct protected by the Act. *See* EPSLA § 5104(1) (prohibiting employers from discharging, disciplining, or discriminating against employees who take leave due to a qualifying COVID-19-related reason); 29 U.S.C. § 215(a)(3) (FLSA's analogous antiretaliation provision). And EPSLA adopts the enforcement mechanisms and penalties laid out in the FLSA. *See* EPSLA § 5105. "Conceptually, then, [EPSLA] retaliation 'may be brought under the FLSA.'" *Colombe*, 2021 WL 1198304, at *3 (quoting *Kofler v. Sayde Steeves Cleaning Serv., Inc.*, No. 20-1460, 2020 WL 5016902, at *2 (M.D. Fla. Aug. 25, 2020)).

So the same burden-shifting *McDonnell-Douglas* framework used in FLSA retaliation cases is applied to EPSLA claims of retaliation. *See Kovacevic v. Am. Int'l Foods*, No. 22-1675, 2023 WL 3756063, at *4 (6th Cir. June 1, 2023); *see also Burgen v. Pine Enters. LLC*, No. 22-13519, 2023 WL 6486476, at *2–3 (N.D. Ga. Oct. 5, 2023) (per curiam).

The *McDonnell-Douglas* circumstantial evidence framework proceeds in three steps. The employee has the initial burden of establishing a prima facie case of retaliation. *See McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). If the employee makes this prima facie showing, the burden of production shifts to the employer "to articulate a legitimate, nonretaliatory reason" for the adverse employment action. *Id.*; *see Kovacevic*, 2023 WL 3756063, at *4 (citing *Kirkland v.*

*City of Maryville*, 54 F.4th 901, 910 (6th Cir. 2022)). If the employer can articulate such a reason, the burden shifts back to the employee to demonstrate by a preponderance of the evidence that the employer's proffered reasons "were factually untrue." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014); *see Adair v. Charter Cnty. of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006). The Court will address each step in turn.

### 1. Connally's Prima Facie Case

To establish a prima facie retaliation claim under EPSLA, an employee must demonstrate "only" that: (1) she engaged in an activity protected by EPSLA, (2) her employer knew that she was exercising her rights under EPSLA, (3) her employer subsequently took an adverse employment action against her, and (4) the EPSLA-protected activity and adverse employment action were causally connected. *See Shibe v. Cardinal Credit Union, Inc.*, No. 21-1436, 2023 WL 5892065, at *3 (E.D. Ohio Sept. 11, 2023); *Wadley v. Nat'l Ry. Equip. Co.*, 572 F. Supp. 3d 361, 370 (W.D. Ky. 2021); (citing *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006)).

Here, the VA does not dispute that Connally engaged in protected activity and suffered an adverse employment action. So the Court deems those elements satisfied. But, argues the VA, Connally cannot establish the second and fourth elements of her prima facie EPSLA retaliation claim: knowledge of decisionmakers and causal connection

"The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.

2000); *see Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) ("The burden of proof at the prima facie stage is minimal . . . ."); *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (explaining that a lower burden of proof must be met to establish a prima facie case than to obtain a judgment on the merits). On summary judgment, an employee meets this initial burden if she presents evidence that either enables a reasonable jury to conclude that she made out each element of her prima facie case or raises a genuine issue of material fact as to these elements. *See, e.g., Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148–49 (2000). "If reasonable minds could differ as to whether a preponderance of the evidence establishes the facts of a prima facie case, then a question of fact does remain, which the trier of fact will be called upon to answer." *Cicero v. Borg-Warner Auto, Inc.*, 280 F.3d 579, 587 (6th Cir. 2002) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 510, 506 (1993)).

Start with knowledge.

According to the VA, Connally cannot meet her prima facie burden on the knowledge element because she cannot show that the relevant decisionmakers—the Summary Review Board, which recommended Connally's termination, and Pamela Reeves, the Detroit VA's medical director who signed off on that recommendation—had knowledge of Connally's request for EPSLA leave. "Because the board and Dr. Reeves were unaware of [Connally's] EPSLA request, it was not possible for them to retaliate against her," says the VA. (ECF No. 28, PageID.1146.)

Connally does not contest that the ultimate decisionmakers were unaware of her request for leave under EPSLA. It is undisputed that the Board members and Reeves knew that Connally requested time off and missed work for COVID-related reasons but did not know about her EPSLA request. (*See, e.g.*, ECF No. 28-6, PageID.1672–1674; ECF No. 28-32; ECF No. 28-34.) And at least some Board members did not know about EPSLA at all—either that the Act existed or that it provided leave that had the potential to excuse Connally's absences marked as AWOL. (*See* ECF No. 28-6, PageID.1679.) The VA contends that this lack of knowledge is fatal to Connally's retaliation claim. It asserts that "it was not possible" for the Board or Reeves to have harbored retaliatory animus without knowing that Connally exercised her statutory rights. (ECF No. 28, PageID.1146.) But the Board's ignorance of her EPSLA request, says Connally, is itself a testament to the retaliatory motives embedded in her termination process. (*See* ECF No. 29, PageID.2739–2740.)

Connally claims that because the Board and Reeves relied on information provided by Nickerson in deciding to fire Connally, Nickerson's knowledge and bias can be imputed to the Board and to Reeves under a cat's paw theory of liability. (*See id.*) The Court agrees.[5]

---

[5] As an initial matter, the Court assumes that, as in FLSA cases, the cat's paw theory is available in EPSLA retaliation cases. *See Godinez v. Custom Apple Packers, Inc.*, No. 22-0011, 2023 WL 2192220, at *7 (E.D. Wash. Feb. 23, 2023) (denying employer's motion for summary judgment on employee's FLSA and EPSLA retaliation claims and reasoning that employee created issue of fact as to pretext "through a 'cat's paw' theory"); *Khorasani v. Mayorkas*, No. 22-00778, 2023 WL 5760024, at *6 (C.D. Cal. Aug. 7, 2023) (granting employer's motion to dismiss employee's FLSA and FFCRA retaliation claims in part because, "[w]hile [employee] does allege that . . . the relevant decision maker[] was liable under the cat's paw

An adverse employment decision is not automatically free from bias just because the ultimate decisionmaker is themselves unbiased or even ignorant of the employee's exercise of protected conduct. "[O]rganizational employers do not operate in a vacuum," and "a decisionmaker might rely on the recommendation of a biased lower-level supervisor." *Marshall v. Rawlings Co.*, 854 F.3d 368, 380 (6th Cir. 2017) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 415, 418–21 (2011)). The cat's paw theory of liability accounts for that reality. It allows courts to impute a non-decisionmaker's knowledge and retaliatory intent to a decisionmaker "where the unbiased decisionmaker relies on information provided by the employee with animus to take an action adverse to the plaintiff." *Ellis v. Prospect Airport Servs.*, No. 17-13852, 2019 WL 1417163, at *7 (E.D. Mich. Mar. 29, 2019) (citing *Marshall*, 854 F.3d at 377); *see Bose v. Bea*, 947 F.3d 983, 990 (6th Cir. 2020). If the employee can show that "a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action," and that "the biased subordinate influenced or was involved in the decision or decisionmaking process," then the employer can be found liable regardless of its "innocence" or ignorance. *Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007) (collecting cases); *Staub*, 562 U.S. at 422.

Naturally, "[t]o avail herself of the 'cat's paw' theory," Connally must provide evidence that would enable a reasonable jury to conclude that Nickerson had

---

theory of liability[,] . . . he fail[ed] to allege facts sufficient to establish anyone's retaliatory animus or a plausible causal connection").

knowledge of the protected conduct and, in turn, possessed retaliatory intent. *Henderson v. Chrysler Grp., LLC*, 610 F. App'x 488, 496 (6th Cir. 2015). Ample evidence supports that Nickerson knew that Connally exercised her EPSLA rights, whether that exercise took the form of Connally's formal EPSLA request, her request for time off for COVID-related reasons, or her related absences.[6]

Connally also provides evidence from which a reasonable jury could find that Nickerson had retaliatory intent, or as Connally put it, was "angry at Connally for taking leave during COVID-19." (ECF No. 29, PageID.2743; *see id.* at PageID.2724–2725, 2739–2740, 2743.) Nickerson's deposition testimony can be read to suggest some level of resentment or ill will toward Connally for missing work due to COVID when "[w]e [the VA] needed everybody there." (*See* ECF No. 28-7, PageID.1833.) For example, Nickerson said that "[a]t the time, everybody was exposed or knew somebody that was exposed. Everybody." (*Id.* at PageID.1835.) She repeated similar sentiments at various points. (*See id.* at PageID.1834 ("During the pandemic there were so many people with COVID that almost every person knew somebody that had COVID and potentially was exposed or had a family member [with COVID].")); *id.* at PageID.1915–1916 ("Everybody is exposed to COVID. During COVID there were numerous people that did not want to come in the building, didn't want to come to work. We had to be there.").) And, as elaborated below, the fact that Nickerson allegedly withheld information from the Board's summary review process can support

---

[6] As the Court discusses later in this section, courts have found that all three of these can be protected activity under EPSLA. *See, e.g.*, *Gracia*, 535 F. Supp. 3d at 1272–73; *Atwood*, 2022 WL 185187, at *6–7; *Rivera*, 2022 WL 4783165, at *2, 4.

the inference that Nickerson had retaliatory intent. A jury could reasonably conclude that Nickerson intentionally "kept [the Board and Reeves] in the dark about Ms. Connally's EPSLA request" to cause them to take adverse employment action against Connally. (ECF No. 29, PageID.2739.)

That said, even if an employee can demonstrate that a non-decisionmaker had the requisite knowledge, retaliatory intent, and influence, liability still would not attach if the decisionmaker "conduct[ed] [her] own investigation," "was presented with all the facts," and "reached a fully-informed decision" that was "free from the taint of the information provided by the employee with animus." *Ellis*, 2019 WL 1417163, at *7 (collecting cases). In that situation, the non-decisionmaker's retaliatory intent can "change . . . from a proximate cause to a cause that is too remote" to support liability. *Id.* What matters is whether the adverse employment decision can be said to have resulted from "reasons unrelated to the supervisor's original biased action." *Staub*, 562 U.S. at 421. The decisionmaker's mere exercise of some judgment "does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm." *Id.* at 419. And if disputed issues of material fact exist as to the level of influence of the biased supervisor on the one hand or the level of independence of the decisionmaker on the other, the employer cannot be entitled to summary judgment.

The record here does not support such independent decisionmaking. The Board relied on Nickerson's recommendation and information in arriving at its decision, especially given Nickerson's integral role in the summary review process. And "the

most probative factor of the cat's paw analysis when determining whether an employee is one whose animus may be imputed to an employer is the 'employee's ability to influence the ultimate decisionmaker.'" *Voltz v. Erie County*, 617 F. App'x 417, 424 (6th Cir. 2015) (quoting *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 353 (6th Cir. 2012)).

In accordance with VA policy, Nickerson not only initiated the Board's review of Connally's employment, but she also curated the evidence file that informed that review. Although Connally's Board was permitted to—and did—conduct its own factfinding and interviews, a reasonable jury could find that that did not suffice to make the Board's investigation sufficiently independent.

Indeed, it appears that the Board gave great deference to the evidence file Nickerson provided and placed great weight on Nickerson's perspective, as VA policy encouraged. VA guidance documents instruct the Board to "[o]nly interview those necessary. If the evidence file is thorough, it can stand on its own." (ECF No. 28-21, PageID.2554.) At the same time, the guidance documents specified that interviewing the supervisor was especially valuable, stating that, "[a]t a minimum, the [Board] should interview the employee's supervisor." (*Id.*) And although Connally, as the employee under review, was given the opportunity to provide information for the Board to consider, that information was not considered "evidence" in the same way as the information provided by Nickerson. Tracy Lane, the Professional Standards Review Board co-chairperson who was also a member of Connally's Board, explained that only management presents or puts on evidence, and information that the

probationary employee provides is "kept separate" from the formal evidence file. (ECF No. 28-6, PageID.1536.)

Further, a factfinder could reasonably infer that the extent of the Board's independence was limited because the Board's review was guided by the evidence that Nickerson provided. Prior to Connally's summary review, James Sperr—who served on Connally's Board as a non-voting "HR technical adviser"—asked Nickerson "to submit an evidence packet on what is relevant to this case," which Sperr then disseminated to the Board, per VA policy. (ECF No. 28-5, PageID.1333; *see* ECF No. 28-6, PageID.1535; ECF No. 29, PageID.2724.) Sperr explained that "it's up to the manager what they provide." (ECF No. 28-5, PageID.1335.) He elaborated:

> [I]f she thinks that what she gave me was relevant, then that's what I go by. I don't know if there's anything else because *I don't know what I don't know.* I'm just going by what the manager provides me and I trust what the manager provides me . . . [N]ow, if I think maybe something else has to be [relevant], then I probably ask them [the supervisor], but most likely if this is the evidence packet . . . and it's relevant to what they want to discipline her for or remove her for during her probationary period, [then] I don't question it.

(*Id.* (emphasis added).) Lane echoed Sperr, noting that, when the Board members received the evidentiary packet from Nickerson by way of Sperr, they "only go by what's presented to [them]," and they "would not know if anything was left out." (ECF No. 28-6, PageID.1591.)

To that end, Connally claims that Nickerson omitted or withheld key "exculpatory" information from Connally's evidence file, thus proximately causing her termination. (ECF No. 29, PageID.2729 n.7; *see id.* at PageID.2728–2731, 2739–2740.)

40

Specifically, she asserts that Nickerson excluded her EPSLA request in May and her various communications with Nickerson in March and April in which she "fully informed" Nickerson "that she would not be coming to work and why she could not." (*Id.* at PageID.2730.) And Connally cites deposition testimony from Sperr and Lane attesting to the relevance of that information. (*See id.* at PageID.2730–2731 (quoting ECF No. 28-5, PageID.1500–1501 ("I believe if we [the Board] would have had these additional documents . . . [the Board] would have had a whole view, overview of what was going on . . . the board might have recommended something less . . . ."); ECF No. 28-6, PageID.1689–1690 (Lane deposition) ("As I sit here today I can say that if all of the evidence were presented, then the outcome may have been different.")); *see also* ECF No. 28-5, PageID.1479–1480 (Sperr deposition) ("[I]f I would have had this [text messages between Connally and her supervisors], it would have definitely made me ask some more questions[,] and even if they wanted to move forward [with summary review] and the board had this, I wish the board would have had this.").)

Likewise, Connally has provided evidence that the Board based its termination decision on its belief that Connally had numerous unexcused absences and had failed to communicate regarding those absences. (*See* ECF No. 28-5, PageID.1374, 1391–1393, 1470–1472; ECF No. 28-6, PageID.1652.) Both Lane and Sperr stated in their depositions that Connally would not have been subject to summary review had her absences been covered by EPSLA. (*See* ECF No. 28-5, PageID.1466; ECF No. 28-6, PageID.1680–1681.) And Sperr further noted that Connally was under review for her

41

AWOL period and her failure to "call in and let [her] manager know what [she was] doing." (ECF No. 28-5, PageID.1471–1472.) In turn, Lane and Sperr suggested that it would have made a difference to see evidence that Connally was communicating with Nickerson about her absences and was seeking leave that could have made her absences statutorily covered. For example, in response to being asked whether it would have "changed [his] mind about the validity of the decision" to have seen texts that Connally sent her supervisors about missing work, Sperr responded, "I think there's a lot of good communication in here. I believe it would have been good for the evidence file. I don't necessarily know if it would have changed [sic], but I think the more information the better." (*Id.* at PageID.1481.)

So while the VA contends that decisionmakers' lack of knowledge defeats Connally's prima facie case of EPSLA retaliation (*see* ECF No. 28, PageID.1146), Connally maintains that their lack of knowledge is precisely the issue (*see* ECF No. 29, PageID.2739–2740). Indeed, given that Nickerson was largely responsible for ensuring that the Board had all the information relevant to its employment decision (*see, e.g.*, ECF No. 28-5, PageID.1333–1335; ECF No. 28-35, PageID.2710), and given Board members' assertions that that "excluded" information could have affected their employment decision (ECF No. 29, PageID.2730), a reasonable jury could find that Board members' ignorance speaks to Nickerson's retaliatory intent and her influence on the Board's decisionmaking. Thus, Connally has produced sufficient evidence to support the assignment of Nickerson's knowledge to the VA under a theory of cat's paw liability.

Next, causation.

"The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283 (6th Cir. 2012) (quoting *Dixon*, 481 F.3d at 333). And on summary judgment, "to establish the element of causal link[,] a plaintiff is required to proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Avery Dennison Corp.*, 104 F.3d at 861 (internal quotation marks omitted); *see Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598 (6th Cir. 2007).

The VA's argument that "Connally cannot establish causation" is similar to its knowledge argument. (*See* ECF No. 28, PageID.1146.) Because Nickerson sought Connally's termination in April 2020, before Connally submitted her request for EPSLA leave in May 2020, the VA says that Nickerson's April action could not have been motivated by Connally's May request. (*See id.*)

The VA is not wrong about the timeline of events. "Nickerson reached out to human resources as of April 15, 2020, to request Connally's termination." (*Id.*; *see* ECF No. 28-20; ECF No. 28-24, PageID.2579–2580.) And Connally requested EPSLA leave by name on May 8 (*see* ECF No. 28-27, PageID.2609)—and could not have done so any time before receiving the VA's May 5 email about hospital employees' entitlement to leave under the Act (*see* ECF No. 28-26, PageID.2590–2591).

43

But for purposes of causation in an EPSLA claim, the relevant conduct is not Connally's May request and Nickerson's April email.

Start with the EPSLA-protected activity. EPSLA's protections are not contingent on an employee making a formal request for EPSLA leave. What it means to "take leave" under EPSLA must be interpreted "broadly" to "effectuate the broad purpose of the Act," that is, "to shield employees from COVID-19-related discrimination—not insulate employers from EPSLA lawsuits." *Gracia*, 535 F. Supp. 3d at 1272.

To that end, courts have found that employees have "taken leave" under EPSLA, and have thus engaged in statutorily protected activity, by informing their employer of their "COVID-19-related 'need for leave,'" asking for time off for qualifying reasons, and missing work for qualifying reasons. *Id.* (quoting EPSLA § 5102); *see id.* at 1272–73 (concluding that it "amount[ed] to taking 'leave'" under EPSLA when employee "informed her manager of her potential COVID-19 exposure and of her consequent need to self-quarantine" and that the employee plausibly alleged EPSLA retaliation because she was fired "shortly after she requested 'leave' to quarantine"); *Rivera*, 2022 WL 4783165, at *2, 4 (concluding that an employee takes leave under EPSLA by missing work for a qualifying reason even if the employee is terminated before they can obtain approval for EPSLA leave); *Hartzell v. Adaptable Sys. Corp.*, No. 21-1873, 2022 WL 1500554, at *13–15 (E.D. Pa. May 11, 2022) (same); *Adkins*, 2022 WL 18532783, at *5 (holding that the employee plausibly pled that he took EPSLA leave, rather than merely requested or attempted to take

44

leave, because he made his request and then "did not return to work after his request for leave over the need to care for his daughter"); *Gerresheimer*, 2022 WL 117768, at *4 (same); *cf. Atwood*, 2022 WL 185187, at *6–7 (holding that a reasonable jury could find that the employee "requested leave" under EFMLEA by asking for time off for a qualifying reason, including by requesting leave for qualifying reasons prior to the FFCRA's enactment and continuing to do so post-enactment).

Connally did all of the above, so "one could conclude that she effectively took leave under the Act." *Rivera*, 2022 WL 4783165, at *4. Evidence shows that Connally informed the VA of her need for leave for qualifying reasons as early as March 14, 2020, when she left work after learning that she had a possible COVID-19 exposure, or on March 15, when she informed Nickerson and sought guidance on next steps. (*See* ECF No. 28-11, PageID.2265.) She has likewise shown that throughout March and April 2020 she continued to request leave for qualifying COVID-related reasons, including that she was caring for her COVID-positive mother, that she was experiencing COVID-19 symptoms, and that she was instructed to self-quarantine. (*See id.* at PageID.2256–2264; ECF No. 28-2, PageID.1180–1190; ECF No. 28-27); *Atwood*, 2022 WL 185187, at *6–7. As Connally says, "The fact that [she] did not use the words 'Emergency Paid Sick Leave'"—nor could have, given that the statute only became applicable to Connally in May—"does not change the fact that a valid request was made prior." (ECF No. 29, PageID.2740.) And in March and April 2020, Connally missed work for the COVID-related reasons she gave Nickerson, and some of those absences later became the basis for her EPSLA request.

A reasonable jury could thus find that Connally engaged in protected conduct not only in May 2020 when she formally requested EPSLA leave but also in April 2020 when she requested time off, and then missed work, for reasons that were arguably qualifying under EPSLA's retroactive application.

A reasonable jury could also conclude that something other than, and later than, Nickerson's April 15 email constituted the relevant adverse employment action—such as the Board's later decision to terminate Connally. So even if the protected conduct occurred when Connally formally requested EPSLA leave on May 8, 2020, a factfinder could still conclude that the adverse employment action occurred after and because of that protected conduct.

An adverse employment action requires "a materially adverse change in the terms and conditions of [a plaintiff's] employment . . . typically marked by a significant change in employment status, including hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010) (alteration in original) (internal quotation marks omitted) (quoting *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795, 798 (6th Cir. 2004) (en banc)).

In contrast, Nickerson's April 2020 email to HR had no ability to result in Connally's firing. Only when Nickerson followed the VA's mandated process, by sending a memo to the appropriate individuals containing the required information and convening a Summary Review Board, was Connally's employment called into question. *See supra* Section I.C. So a reasonable factfinder could disagree with the

46

VA's argument that Nickerson's April 15, 2020, email to HR constituted the adverse employment action, as it had little if any ability to affect Connally's employment status.[7]

But, argues the VA, Nickerson had made up her mind about seeking Connally's termination well before those events. (*See* ECF No. 28, PageID.1146.) That was why she emailed HR about it in April. True, courts have granted employers summary judgment where evidence shows that the decision to fire the employee preceded the employee's protected activity even if the termination came later. "Employers need not suspend previously planned [termination,] . . . and their proceeding along lines previously contemplated . . . is no evidence whatever of causality." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001). So the VA emphasizes that Nickerson initially requested Connally's termination on April 15 and then reiterated that request on April 21, "[e]ven after" learning that Connally planned to return to work on April 23. (*See* ECF No. 28, PageID.1146.)

On this point, a genuine dispute of material fact still exists. Nickerson sent two emails to HR about Connally's termination in April 2020, but then about a month passed between Nickerson's latter email on April 21 and her formal initiation of the summary review process on May 19. This evidence could lead a reasonable jury to conclude that Nickerson had not made a final decision prior to Connally's EPSLA request. *See Arban v. W. Publ'g Corp.*, 345 F.3d 390, 401–02 (6th Cir. 2003)

---

[7] The Court questions whether Nickerson's April email constitutes an adverse employment action but analyzes it as such in light of the VA's argument.

(concluding, despite employer's "considerable evidence that the decision to terminate [the employee] had been made before [the employee] went on medical leave," that a reasonable jury could conclude that the employer "was continuing to study the matter and had not come to a final decision" by the time the employee took leave); *Kovacevic v. Am. Int'l Foods, Inc.*, No. 21-72, 2022 WL 2589864, at *6–7 (W.D. Mich. July 8, 2022); *Atwood*, 2022 WL 185187, at *7. And the Board certainly had not—it voted to terminate Connally much later.

In sum, the Court concludes that Connally's evidence is sufficient to make out a prima facie case of EPSLA retaliation.

### 2. The VA's Proffered Reason

At the second step of the *McDonnell-Douglas* framework, the burden of production shifts to the employer to articulate a nondiscriminatory reason for its adverse employment action.

The VA asserts, and ample evidence supports, that Connally was terminated "based on her attendance." (ECF No. 28, PageID.1146; *see also* ECF No. 28-33, PageID.2697 (written notice informing Connally that a Summary Review Board would convene "to review your unacceptable conduct; specifically, your attendance"); ECF No. 28-35, PageID.2710–2711 (formal write-up of Board's findings and conclusion, including that "[t]he Board sustains the charge of alleged misconduct of AWOL time/attendance" and "recommends separation of Latonya Connally from VA employment").) And "[t]here is no question that in the Sixth Circuit excessive

absenteeism is a legitimate reason to terminate an employee." *Wadley*, 572 F. Supp. 3d at 371–72 (collecting cases).

But "excessive absenteeism" is not a legitimate, nonretaliatory reason for discharge when the absences at issue constitute statutorily protected activity. Intuitively, if an employer fires an employee for missing work, but the employee's absences were pursuant to a leave-granting statute, then the employer has taken an adverse action against that employee based on the employee engaging in protected activity. In that situation, the employee's excessive absenteeism is the opposite of a legitimate, nondiscriminatory reason for termination; it is the essence of a retaliatory reason. Discharge for statutorily protected leave is precisely what antiretaliation provisions aim to guard against.

Put another way, it is only legitimate and lawful to fire an employee for numerous *unexcused* absences that are separate from or in addition to any absences that were covered by a leave-granting statute such as the FMLA or FFCRA. *See id.* at 372 ("In the nine months that Wadley worked at NRE, he totaled fifteen unexcused absences and fourteen instances of being tardy or clocking out early. Those figures *do not include vacation days, personal/sick days, or EPSLA leave.*" (emphasis added)); *Summerville v. Esco Co. Ltd. P'ship*, 52 F. Supp. 2d 804, 813 (W.D. Mich. 1999) ("ESCO claims that Summerville 'was fired because of his long history of unexcused absences,' *excluding those absences covered by FMLA.* . . . Accordingly, the Court concludes that ESCO has asserted a legitimate nondiscriminatory reason for Summerville's termination." (emphasis added)).

49

So if Connally was entitled to EPSLA leave for absences that justified her termination, then her absenteeism would not have been a legitimate reason for her firing. And the VA would have failed to discharge its burden under the *McDonnell-Douglas* framework. It is rare for an employer to cite as their legitimate, nondiscriminatory reason (excessive absenteeism) what is instead an illegitimate, discriminatory reason (COVID-related absences under EPSLA) if the employee can establish her claim of wrongful denial of leave. But that appears to be what the VA has done here. So the VA is not entitled to summary judgment on Connally's EPSLA retaliation claim. *See St. Mary's Honor Ctr.*, 509 U.S. at 511 ("[R]ejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination . . . ." (emphasis omitted)).

### 3. Pretext

Even if the VA could somehow proceed past the second step of the *McDonnell-Douglas* analysis, Connally must demonstrate that it is more likely than not that the VA's asserted reason for termination "is a pretext, or coverup," for unlawful retaliation. *Kovacevic*, 2023 WL 3756063, at *5 (citing *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496, 503 (6th Cir. 2007)). "[T]he defendant can be awarded summary judgment only if no reasonable jury could conclude that the reasons offered for the plaintiff[']s dismissal[] were only a pretext hiding a discriminatory motive." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 547–48 (6th Cir. 2004); *see LeVine v. Dejoy*, 64 F.4th 789, 798–99 (6th Cir. 2023).

50

Employees generally establish pretext by showing that the employer's proffered reasons (1) had no basis in fact, (2) did not actually motivate the adverse employment action, or (3) were insufficient to motivate the employer's action. *See Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020); *Kovacevic*, 2023 WL 3756063, at *5 (citing *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012)). Connally is also "free to pursue arguments outside these three categories." *Miles*, 946 F.3d at 888. As long as she "produce[s] sufficient evidence from which a jury could reasonably reject [the VA's] explanation of why it fired her," Connally can carry her burden at summary judgment. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

Connally's first pretext argument appears to be that the VA's proffered reason either had no basis in fact or did not actually motivate its action. And she raises a genuine issue of material fact that must go to a jury.

Connally addresses the VA's assertion that the secondary effects of Connally's absences motivated Connally's discharge—that Connally's "attendance was impacting the VA's ability to manage staff and provide care." (ECF No. 28, PageID.1146.) Connally responds, "Defendant's argument that Connally's absence had a negative impact on staffing and caused frustration on behalf of management, particularly during the pandemic, was directly at odds with the facts—namely, Defendant had additional nursing staff assigned from other locations." (ECF No. 29, PageID.2740–2741.) Further, she contends that the VA's reason must be pretextual because it would not make sense for the VA to want someone with COVID-19 to

51

"report[] to work . . . to infect at-risk, immune-compromised veteran-patients." (*Id.* at PageID.2741.)

In support of her assertion, Connally cites the deposition testimony of Jamal Abdellateef, the assistant nurse manager of the Domiciliary—the residential care program where Connally was working in March and April 2020 when she was absent. (*See id.* (citing ECF No. 28-9, PageID.2234–2238).) Abdellateef testified that, in addition to Connally, three other registered nurses were working for the Domiciliary program while Connally was absent in March and April, a greater number than were working there prior to March 2020. (*See* ECF No. 28-9, PageID.2234.) "The VA ended up getting us help" by transferring nurses from another Michigan VA facility to the Detroit VA, he explained. (*Id.*; *see id.* at PageID.2228, 2233.) But Abdellateef elaborated that the transferred nurses "weren't fully trained to be with us. . . . The RNs were more like techs than anything." (*Id.* at PageID.2236.) And in pages Connally does not cite, the nursing manager explains that "they were not functioning as" registered nurses because the Detroit VA did not have time to orient them. (*See id.* at PageID.2239, 2242.) So a finder of fact must assess this competing evidence to determine whether the VA's assertion of staffing shortages is pretextual. The issue cannot be resolved on summary judgment.

Finally, Connally rebuts the VA's proffered reason by providing evidence that discriminatory animus "was the true motivation driving the employer's determination." *Myers v. U.S. Cellular Corp.*, 257 F. App'x 947, 954 (6th Cir. 2007) (alteration in original) (internal quotation marks omitted). "Pretext may be

demonstrated 'directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Pickens v. MetalTek Int'l, Inc.*, No. 15-2429, 2018 WL 6567794, at *5 (N.D. Ohio Dec. 13, 2018) (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981)). "[A]t bottom, the [pretext] question is always whether the employer made up its stated reason to conceal intentional discrimination." *Chen*, 580 F.3d at 400 n.4.

According to Connally, "[t]he pretext for [her] termination is crystal clear: Nickerson and Gresham were angry at Connally for taking leave during COVID-19, even if she was legally entitled to it." (ECF No. 29, PageID.2743.) As already explained, Connally has produced sufficient evidence for a reasonable jury to conclude that Nickerson harbored retaliatory animus as a result of Connally's COVID-related leave.

Accordingly, the VA's motion for summary judgment on Connally's EPSLA retaliation claim is denied.

## V. FMLA Retaliation

Connally also asserts a claim of FMLA retaliation. She says that the VA terminated her for requesting intermittent leave under the FMLA in June 2020. (*See* ECF No. 1, PageID.10–11.) "While Defendant granted Plaintiff's request for FMLA leave, it terminated her three weeks later citing attendance as the reason for Plaintiff's termination." (*Id.* at PageID.10.) The VA's defense is similar to its response to Connally's EPSLA retaliation claim: "because her termination was underway in

April 2020, well before her June 2020 request for FMLA leave," Connally can establish neither knowledge nor causation and cannot make out a prima facie case of FMLA retaliation. (ECF No. 28, PageID.1148.) But while Connally's EPSLA retaliation claim survives, her FMLA retaliation claim does not.

The key difference between Connally's FMLA and EPSLA retaliation claims is the relevant timeline. Whereas sufficient evidence supports a reasonable jury in concluding that Connally engaged in EPSLA-protected activity prior to the VA taking adverse employment action against her, that the two events were causally related, and that Nickerson's knowledge and animus regarding Connally's EPSLA leave can be computed to the Board, the timeline of events does not support the same conclusions with respect to any FMLA-protected activity. So Connally cannot make out a prima facie case of FMLA retaliation.

It is undisputed that Connally became eligible for and requested FMLA leave in June 2020. (*See id.*; ECF No. 29, PageID.2743.) The exact date of her request is unclear, but she stated in her deposition that she applied for FMLA leave "once [she] hit the threshold of . . . being able to qualify"—i.e., as of about June 9, 2020, 12 months after she started working for the VA. (ECF No. 28-2, PageID.1222; *see* ECF No. 28-32, PageID.2654; ECF No. 28-36, PageID.2712.) By that time, though, Nickerson had already formally triggered the summary review process with her May 19 email. And by June 4 Nickerson had also provided the Board with the contents of Connally's evidence file, so the cat's paw theory that supports a finding of knowledge under EPSLA does not hold water here. The Board could not have adopted

Nickerson's alleged retaliatory animus by relying on the information she provided when that retaliatory animus could only have formed after the information had already been provided.

Rather than offering evidence to show that her discharge was related to her FMLA request in June, Connally focuses on "the fact that Nickerson and Gresham were in a hurry to terminate her in April 2020 because she would soon be eligible for FMLA." (ECF No. 29, PageID.2742 (emphasis omitted).) Connally cites emails in which Nickerson and Gresham (the service chief who approved Connally's leave without pay in March) emphasize the "short time frame" for completing the summary review process before Connally became eligible for FMLA leave. (*See id.* at PageID.2743.) But the fact that Gresham herself was pointing out Connally's impending FMLA eligibility underscores her awareness that Connally had not yet requested FMLA leave. And that undercuts Connally's claim that her FMLA request caused her discharge.

There is a second problem with Connally's argument that the VA "made every effort to have [Connally] terminated before . . . [she] became eligible for FMLA": it relies on a theory of FMLA eligibility that the Sixth Circuit has not adopted.

To allow an FMLA claim based on Connally's allegation that the VA terminated her to *prevent* her from becoming eligible for FMLA leave (even though she did eventually become eligible for and request FMLA leave), this Court would have to accept that FMLA relief is available to "pre-eligible" employees. This is the position of the Eleventh Circuit. That court has held that the FMLA protects "a pre-

eligibility request" for "post-eligible leave" so that, if an employer fires a pre-eligible employee "to avoid having to accommodate that employee with rightful FMLA leave rights once that employee becomes eligible," the employee has a cause of action. *Pereda v. Brookdale Senior Living Cmtys., Inc.*, 666 F.3d 1269, 1275 (11th Cir. 2012).

But the Sixth Circuit applies the "eligible employee" requirement. *See Humenny v. Genex Corp.*, 390 F.3d 901, 905-06 (6th Cir. 2004) (holding that the FMLA's "eligible employee" requirement "applies in all FMLA cases"); *Staunch v. Cont'l Airlines, Inc.*, 511 F.3d 625, 629–31 (6th Cir. 2008) (explaining that an employee must be eligible for FMLA leave at the time of their leave request to state an FMLA claim); *Davis v. Mich. Bell Tel. Co.*, 543 F.3d 345, 354 (6th Cir. 2008) ("To the extent she is claiming that she was terminated because of her attempt to obtain FMLA leave . . . her claim must fail as a matter of law because she was not eligible for FMLA benefits . . . ."). And this District, like others in the Sixth Circuit, has declined to depart from that binding precedent post-*Pereda. See Moore v. Lenderlive Network, Inc.*, No. 14-11324, 2015 WL 470599, at *4 (E.D. Mich. Feb. 4, 2015); *Dunn v. Chattanooga Publ'g Co.*, No. 12-252, 2013 WL 145865, at *4–6 (E.D. Tenn. Jan. 14, 2013) ("Based on Sixth Circuit precedent, as well as the Sixth Circuit's past handling of critical elements of *Pereda*'s analysis, the Court concludes it is bound to the same analysis underlying its [previous] decisions . . . ."); *see also Berry v. SAGE Dining Servs., Inc.*, No. 19-00830, 2021 WL 3037483, at *5 (M.D. Tenn. July 19, 2021) (rejecting *Pereda* because it would go "far beyond what the Sixth Circuit has recognized" and adding that, there unlike in *Pereda*, it was disputed whether the

employee would ever be an "eligible employee"); *see also Hill v. Walker*, 737 F.3d 1209, 1215 (8th Cir. 2013) (reasoning that the employee's appeal would fail even if the Eighth Circuit adopted *Pereda* because the employee could not show she would have become "eligible" under the FMLA).

Connally does not acknowledge that she is essentially asking the Court to depart from this well-established Circuit precedent, let alone explain why the Court should do so. Like other district courts in this Circuit, this Court declines that invitation.

Even if the Court were to accept *Pereda*'s interpretation of the FMLA, Connally's pre-eligibility argument fails for an additional reason: it sounds more in FMLA interference than retaliation, and Connally asserts only retaliation. Interference and retaliation are the two recognized theories of recovery under the FMLA. *See* 29 U.S.C. § 2615(a); *Milman v. Fieger & Fieger, P.C.*, 58 F.4th 860, 866–67 (6th Cir. 2023); *Tennial v. UPS, Inc.*, 840 F.3d 292, 307 (6th Cir. 2016). Interference occurs when an employer denies an employee's statutory rights under the FMLA, while retaliation requires the additional showing that the employer's adverse action was taken *because* the employee invoked their FMLA rights. *See Tennial*, 840 F.3d at 307–08; *Milman*, 58 F.4th at 866. Connally alleges that, although she remained employed by the VA long enough to request and be granted FMLA leave (*see* ECF No. 1, PageID.10), the VA wanted to fire her prior, to keep her from becoming eligible under the Act (*see* ECF No. 29, PageID.2743). She contends that the VA took adverse action against her not because she attempted to exercise

her FMLA rights but because it *anticipated* that she would. And "interference" includes employer conduct aimed at deterring or chilling an employee from exercising their FMLA rights. *See Dyer v. Ventra Sandusky, LLC*, 934 F.3d 472, 476 (6th Cir. 2019). According to the FMLA's implementing regulations, interference includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave. It would also include manipulation by a covered employer to avoid responsibilities under FMLA." 29 C.F.R. § 825.220(b); *see Arban*, 345 F.3d at 402; *Blank v. Nationwide Corp.*, No. 20-3969, 2021 WL 3469187, at *6 (6th Cir. Aug. 6, 2021); *Hurtt v. Int'l Servs., Inc.*, 627 F. App'x 414, 424 (6th Cir. 2015). So Connally's evidence that the VA attempted to prevent her from qualifying for, requesting, or taking FMLA leave goes not to retaliation but to interference—which Connally failed to plead.

Finally, and for similar reasons, Connally's FMLA claim fails as a matter of law to the extent that it is based on her COVID-related absences rather than her June 2020 FMLA request. She claims that she was terminated not only to keep her from becoming FMLA-eligible but also because "Nickerson and Gresham were angry at Connally for taking leave during COVID-19." (ECF No. 29, PageID.2743.) But because Connally was not an eligible employee under the FMLA any time before June 2020, leave taken in March and/or April 2020 is not FMLA-protected activity and the VA's response to that leave could not constitute retaliation for exercising FMLA rights.

Even when viewed in the light most favorable to Connally, Connally cannot establish a prima facie case of FMLA retaliation. Thus, the Court concludes that the VA is entitled to summary judgment as to Connally's FMLA retaliation claim.

## VI. State Law Claim

Finally, Connally alleges that the Detroit VA violated the then-effective Michigan COVID-19 Employment Rights Act ("CERA"), Mich. Comp. Laws §§ 419.401–.413 (repealed July 1, 2023), by "[t]erminating her for not reporting to work while she was caring for her sick mother and experiencing COVID-19 symptoms" (ECF No. 1, PageID.12). Under CERA, employees who "display[ed] the principal symptoms of COVID-19," or who had come into close contact with someone who either tested positive for or "display[ed] the principal symptoms of COVID-19," had to stay home from work until certain conditions were met. Mich. Comp. Laws § 419.405.

The VA argues that Connally's CERA claims should be dismissed because CERA does not and cannot waive the United States' sovereign immunity. (*See* ECF No. 28, PageID.1148–1150.) It argues that CERA's definition of "employer" does not encompass the VA, and even if it did the VA "would not be subject to [CERA] in any event, because only Congress can waive sovereign immunity." (*Id.* at PageID.1149 (citing *S. Rehab. Grp., P.L.L.C. v. Sec'y of Health & Hum. Servs.*, 732 F.3d 670, 676 (6th Cir. 2013)).) So the VA asserts that Connally's Michigan law claim "must be dismissed." (*Id.* at PageID.1150.)

Connally agrees. In her response, she "does not contest" that the VA is entitled to summary judgment on her CERA claim. (*See* ECF No. 29, PageID.2743.) Accordingly, the Court dismisses Connally's claim under CERA (Count IV).

## VII. Conclusion

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART the VA's motion for summary judgment (ECF No. 28).

Accordingly, the following claims are dismissed: Connally's EPSLA interference claim (Count I), FMLA retaliation claim (Count III), and her claim under Mich. Comp. Laws §§ 419.401–.413 (Count IV). Connally's claims for unpaid EPSLA leave (Count I) and EPSLA retaliation (Count II) survive.

SO ORDERED.

Dated: March 28, 2024

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE